225 So.2d 821

Elijah BRIDGES, Jr.

v.

STATE of Alabama.

1 Div. 450.

Supreme Court of Alabama

Aug. 7, 1969.

Palughi & Palughi, Mobile, for appellant.

MacDonald Gallion, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.

LIVINGSTON, Chief Justice.

This is an appeal from a judgment of the Circuit Court of Mobile County, Ala-

bama, finding the defendant, Elijah Bridges, Jr., guilty of murder in the first degree and sentencing him to life imprisonment.

Defendant and a codefendant, Edward Braggs, were indicted and tried separately for the murder of Rawley Hall. Defendant was adjudged indigent and is represented on this appeal by court-appointed counsel who represented him at trial.

The deceased lived in Prichard with her son, Jerry Hall, who was employed as a pharmacist at Providence Hospital. On July 17, 1966, Jerry ended his work shift at the hospital about 11:15 P.M. He and a nurse left the hospital around 11:30 P.M., went to a drive-in for a sandwich, then returned to the hospital parking lot for the nurse's car. Jerry then followed the nurse to her home and saw her safely inside. Upon arriving at his own home between 1:00 and 1:30 A.M. on July 18, 1966, Jerry checked to see that his mother was all right, after which he retired in another room.

Jerry was awakened sometime later by the groans of his mother. He called to her and asked what was the matter; she replied by asking that he get her something for a terrible headache. Jerry went to the kitchen, turned on the light, and noticed that the time was 3:35 A.M. At that point, he decided that he should first check with his mother as to any medication she had taken earlier. He went to the mother's bedroom, but did not turn on the bedroom light. From the light in the kitchen, he could see blood all over his mother's "face and what not." He then went to the bathroom to get a cloth with which to wipe his mother's face. Upon turning the light on in the bathroom, Jerry found blood all over the walls and floor. He immediately called for an ambulance, after which he called a Dr. Henry Gwynn, and an uncle who lived nearby, Roy Stringer. He then took a damp cloth from the bathroom, returned to his mother's bedroom and turned on the light, at which point he discovered blood all over the floor and bed. He remained with his mother until the uncle whom he had called earlier arrived.

Everything was intact in the house, except for a pair of pants which Jerry had taken off upon retiring and placed at the foot of the bed in his room. The pants, less a $5.00 bill which had been in the pocket, were found on a loveseat in the dining room.

An examination at the hospital to which Mrs. Hall had been removed by ambulance revealed a laceration of the scalp, a little over one inch in length and about one-half inch in width; the skull was fractured. Surgery was performed, but Mrs. Hall died approximately 27 hours after being admitted to the hospital. The cause of death was listed as brain damage resulting from the injury.

Lt. Blake of the Prichard Police Department arrived on the scene of the crime about 5:00 A.M. and an examination of the house and surrounding area was commenced. Blood was found on Mrs. Hall's bedclothes and a trail of blood led from her bedroom to the bathroom. Blood was on the bathroom floor and walls. Two oak leaves were found on a throw rug in the hallway. The window in the dining room was raised several inches; indentations apparently made by some sort of tool appeared thereon. On the ground outside the window a section of pipe approximately 30 inches in length was discovered; it appeared that this section of pipe had been removed from a pile of similar pipes in a nearby storeroom. A broken branch was found under a bush just outside the window.

The defendant, a Negro male, was 17 years of age when he was taken into custody between 10:00 and 11:00 A.M. on July 20, 1966, by officers of the Prichard Police Department. He was first taken to the Juvenile Division of the Police Department, fingerprinted and photographed, and then removed to the Detective Division of said Department at approximately 2:00 that afternoon. Sometime during the afternoon, he accompanied two police officers, in a police vehicle, to the area of his resi-

dence, where one of the officers talked briefly with defendant's mother, who came to the side of the vehicle.

At 6:35 P.M. on July 20, 1966, Bridges was booked on a charge of "D & S," apparently a charge placed against a suspicious person while an investigation is conducted.

The evidence tended to show that the defendant received a meal in a cell about 6:30; sanitation facilities were available to him at this time. About 7:30 P.M., he was returned to the Detective Division and the presence of police officers Gilbert and Rigsby of the Prichard Police Department. Detective Bell of the Mobile Police Department arrived between 7:30 and 8:00 P.M. Around 9:00 P.M., the defendant made an oral statement to Detective Bell, after which he accompanied officers to the scene of the crime and allegedly further implicated himself. After returning to the police station, Bridges repeated his earlier oral statement to Lt. Blake at approximately 11:00 P.M. Shortly after midnight, Detective Reynolds of the Prichard Police Department took a written statement from the defendant which concerned the earlier oral statements; this statement was signed by Bridges

At 2:40 A.M. on July 21, 1966, Bridges was booked on a charge of burglary of Levine and Sanders, a hardware store in the vicinity of the Hall residence, which had been burglarized on the same night as the Hall murder occurred. On July 26, 1966, Bridges was booked on a charge of murder. Trial date (evidently arraignment) was set July 29, 1966; a bond of $10,000 was set on each of these charges.

The evidence tended to show that the Hall residence was burglarized about 3:35 A.M. on July 18, 1966. The State advanced the contention that Mrs. Hall was struck a mortal blow with the pipe found outside the window when she surprised the codefendant, Braggs, in the Hall residence. It further contended that the defendant herein, Bridges, acted as a lookout, remaining outside the Hall residence, while Braggs entered the house.

On appeal, defendant argues seven assignments of error, which will be treated in the order presented in brief

Assignment of error No. 1 is premised upon the contention that the trial court erred in denying defendant's motion to quash the indictment returned by a grand jury from which women were totally excluded.

The defendant was indicted on September 28, 1966. On the same day, the codefendant, Braggs, was indicted for the same offense, murder in the first degree. Braggs was convicted of said offense on February 3, 1967. Bridges was convicted on March 24, 1967.

The same contention was made in Braggs v. State, 283 Ala. 570, 219 So.2d 396, as is made here, and was disposed of by the decision in the *Braggs Case,* rendered by this Court on February 13, 1969. See Braggs v. State, supra. We see no point in reiterating what we so recently said in the opinion in the *Braggs Case* as to this contention, but merely point to that decision as the answer to the appellant's contention here.

In assignment of error No. II, appellant argues that the trial court erred in denying the defendant's motion to strike the jury venire, filed on March 17, 1967, in that the jury lists or rolls prepared by the jury commission did not contain the names of all citizens qualified to serve on juries, but in fact such rolls contained the names of only a few of the total number of citizens qualified to serve in Mobile County, Alabama. Although the appellant attempts to distinguish assignment of error No. II from assignment of error No. I by stating in argument that this assignment of error, No. II, is based upon the failure of the jury commission of Mobile County, Alabama, substantially if not totally, to perform its duty to place the names of all qualified citizens of said county on the jury roll as required by statute, his argu-

ment is based primarily upon the exclusion of women from the jury rolls. To the extent that his argument is so premised, our conclusion in assignment of error No. I is equally applicable here. See Braggs v. State, supra.

■ As to that portion of appellant's argument based upon the failure of the jury commission of Mobile County, Alabama, to include the name of every qualified juror in said county on the jury rolls, we adhere to that which was said by this Court in Fikes v. Alabama, 263 Ala. 89, 81 So.2d 303, reversed on other grounds in 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246, to wit:

" * * * There is no legal reason for quashing an indictment or venire simply because the jury commission did not put the name of every qualified person on the roll or in the jury box, in the absence of fraud (or a denial of constitutional rights). * * * "

Appellant urges no fraud on the part of the jury commission of Mobile County, Alabama, in the preparation of the jury rolls. In the absence of such a showing, appellant's assignment of error No. II is without merit as to this contention. As we said in Black v. Wilson, 281 Ala. 6, 9, 198 So.2d 286:

" * * * The presumption prevails that public officials charged with a duty will perform that duty. Leonard v. State, 38 Ala.App. 138, 79 So.2d 803, cert. denied 262 Ala. 702, 79 So.2d 808; Smith v. State, 223 Ala. 11, 136 So. 265."

In assignment of error No. III, appellant claims that the trial court erred in restricting the cross-examination of the State's witness, Detective Bell.

The trial court properly heard testimony concerning the voluntariness of the defendant's statements outside the presence of the jury. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908.

The State's attorney explained that the written statement given by the defendant to Detective Reynolds in the early morning of July 21, 1966, was not introduced into evidence, as it might contain something which would call to the attention of the jury another burglary, that of Levine and Sanders, which had been committed on the same night as the Hall murder and with which defendant had been charged on July 21, 1966. The trial judge issued an order early in the trial that all reference to any other crimes with which the defendant might in any way be connected be avoided. It is the contention of appellant that it was necessary that he cross-examine Detective Bell on the content of the written statement, in order to resolve certain discrepancies between the oral and written statements.

This Court stated in Mason v. State, 259 Ala. 438, 66 So.2d 557, 42 A.L.R.2d 847:

"The general rule in Alabama is that evidence of distinct and independent offenses is not admissible in the trial of a person accused of a crime. Brasher v. State, 249 Ala. 96, 30 So.2d 31; Harden v. State, 211 Ala. 656, 101 So. 442; Weatherspoon v. State, 36 Ala.App. 392, 56 So.2d 793; Baker v. State, 19 Ala. App. 437, 97 So. 901, certiorari denied 210 Ala. 320, 97 So. 903."

■ It has been repeatedly held by this Court that the scope and extent of cross-examination is vested in the sound discretion of the trial court, and its rulings will not be disturbed in the absence of a clear showing that error intervened to the prejudice of the objecting party. Fuller v. State, 269 Ala. 312, 113 So.2d 153; State v. Hargrove, 282 Ala. 13, 208 So.2d 444. We find no error in the trial judge's ruling restricting the cross-examination of Detective Bell relative to the written confession, such restriction being for the purpose of avoiding any reference to other crimes with which the defendant was allegedly connected in any way.

■ Appellant contends, in assignment of error No. IV, that the trial court com-

mitted error in allowing into evidence over defendant's objection certain pants allegedly belonging to Braggs, the co-defendant, and worn by Braggs on the night of the murder of Mrs. Hall. Appellant urges that no evidence was presented at trial to establish the ownership of the pants in question.

Detective Reynolds, on cross-examination, testified as follows:

"Q. Did you tell her [Braggs' sister] that you would like the clothes that your brother wore on such and such a date?

"A. I believe I did. Maybe I said a pair of dungarees."

There is lacking in the record any showing that the pants picked up by Detective Reynolds at the home of Braggs' sister, given to him upon his request that he be furnished the pants Braggs was wearing at the time in question, were other than the pants subsequently turned over to Dr. Grubbs, of the State Department of Toxicology, for laboratory examination. It was determined that paint scrapings and fibers taken from the dungarees matched paint from the window sill of the Hall residence and fibers from the spread on the deceased's bed, respectively. It is not the *ownership* of the pants that is determinative of the issue, but rather, *who was wearing the pants* on the night of the Hall murder. The testimony indicates that Braggs was wearing the pants at that time.

Assignment of error No. V questions the correctness of the action of the trial court in denying appellant's motion to exclude the evidence. Appellant particularly urges that the jury in the trial below could not reasonably infer the existence of the corpus delicti from the evidence presented. An excerpt from the opinion of this Court in Braggs v. State, 283 Ala. 570, 571, 219 So.2d 396, 403, supra, answers this contention.

"Defendant relies on statements in the testimony of the doctors to effect that deceased could possibly have received her skull injury as the result of a fall against the bath tub, lavatory, commode, furniture, or other object, and also the evidence that deceased had been treated by a physician for 'a mild type of congestive heart failure.' She had complained of her heart beating rapidly.

"If it be conceded that it was possible for her to have been injured by a fall as well as by a blow, there remain to be considered, the leaves and debris on her bed, the partly opened window, the tool marks on the window, the blood on the floor and in the bathroom, the $5.00 missing from the son's pants, and the moving of the pants. This evidence, which is independent of any statement by defendant, is sufficient, we think, to support an inference that someone entered the house and struck her, and that such an inference is reasonably more probable than an inference that she fell, struck her head, spread blood around the bathroom, and returned to bed; all without waking the son who was later awakened by her groaning."

In Hines v. State, 260 Ala. 668, 671, 72 So.2d 296, 298, this Court said:

"* * * As has been previously pointed out by this court in many cases, the corpus delicti is a fact, proof of which may be established by circumstantial evidence, and if there is a reasonable inference to prove its existence the court should submit to the jury for consideration the question of the sufficiency and the weight of the evidence tending to support that inference. * * *"

■ The oral confession of the defendant was found to have been voluntarily given. It is inadmissible for the purpose of prima facie proof of the corpus delicti. Shelton v. State, 217 Ala. 465, 117 So. 8. But, "inconclusive facts and circumstances tending prima facie to show the corpus delicti may be aided by the admissions or confession of the accused so as to satisfy the jury beyond a reasonable doubt, and

**418**

so to support a conviction, although such facts and circumstances, standing alone, would not thus satisfy the jury of the existence of the corpus delicti. Matthews v. State, 55 Ala. 187, 195; Ryan v. State, 100 Ala. 94, 95, 14 So. 868." Hill v. State, 207 Ala. 444, 446, 93 So. 460, 462. The facts of this case bring it squarely within this rule.

■ Appellant first contends in assignment of error No. VI that the State's violation of its own "prompt arraignment statute," Section 160, Title 15, Code of Alabama 1940, mandates the exclusion at trial of any statement obtained during such period of illegal detention. We pretermit any extended consideration of the contention that defendant was illegally detained, it being a well-established rule in this State that even if an individual is illegally detained, such detention in itself does not render a confession obtained during such detention inadmissible. Ingram v. State, 252 Ala. 497, 42 So.2d 36; Hutto v. State, 278 Ala. 416, 178 So.2d 810.

The rule enunciated in Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed. 2d 1479, providing that arresting officers are allowed "little more leeway than the interval between arrest and the ordinary administrative steps required to bring a suspect before the nearest available magistrate," Id., at 453, 77 S.Ct., at 1359, has not been extended in its application to state court proceedings. Hutto v. State, supra.

Appellant further argues in assignment of error No. VI that he was not given full and effective warning of his rights under the Fifth Amendment; that he did not make a voluntary and intelligent waiver of his constitutional right to remain silent and to have a lawyer present; and that the alleged oral confessions were not voluntarily made and by necessity he could not have made an intelligent waiver of his constitutional right to remain silent.

Lt. Blake testified that he explained to the defendant his constitutional rights on the afternoon of July 20, 1966, as follows:

"A. I explained his rights to him, his right to have counsel present with him before he answered any questions and that he did not have to answer any questions and if he did so it could be used in Court against him and also the fact that if he could not afford a lawyer that the State would appoint him one.

"Q. Did he appear to understand what you were telling him?

"A. Yes.

\*   \*   \*   \*   \*   \*

"Q. Did he make any request to have any counsel to be present with him? During this interrogation or at any time?

"A. No sir.

"Q. All right. Now did you or anyone else in your presence use any force in order to get this man to discuss any matter with you?

"A. No sir.

\*   \*   \*   \*   \*   \*

"Q. Did you offer him any promise or hope of reward?

"A. No sir.

"Q. Did you offer him any inducement in order to get the—to get him to discuss anything with you?

"A. No sir."

Detective Bell testified that he questioned the defendant about the murder of Mrs. Hall on the night of July 20, 1966, and that he advised Bridges, the defendant, of his constitutional rights prior to any questioning.

"Q. What if anything did you say to him?

"A. When I came in they brought him in and I told him who I was that I was Hubert Bell working for the Mobile Police Department and I told him what I was going to talk to him about was a serious matter and that it concerned a

murder case of Mrs. Hall. That this murder happened in Prichard and I told him before I questioned him on anything that I would advise him of his rights.

"Q. What was the nature of your advice to him?

"A. After I told him that I told him he had a right to use the telephone, that he could use it if he wished. And I told him he had a right to remain silent and that anything he said could and would be used against him in a Court of law. That he had a right to talk to a lawyer and to have him present before he answered any questions and that if he could not afford to hire a lawyer the State would appoint him one to represent him and that at any time that he wished to stop answering any questions he was free to do so.

"Q. Did he appear to understand what you were telling him?

"A. Yes sir. I asked him did he understand what I was saying to him and he said yes.

"Q. All right. Now did you or any of those detectives you have named were present offer him any reward, promise of reward, offer of immunity in order to get him to discuss any matter with you?

"A. No sir."

Detective Gilbert in his testimony stated that he was present when the warnings were given to the defendant by Detective Bell.

"Q. Basically that's what he told him?

"A. Yes.

"Q. In substance?

"A. Yes. He also asked him if he did want a lawyer at the time and he said no. And he asked him if he understood it and he said yes. He said he could have a lawyer at any time that he wanted a lawyer present.

"Q. You heard him answer no he didn't want a lawyer?

"A. That's right.

"Q. You heard him say it?

"A. Yes."

The holding of the Supreme Court of the United States in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, rendered on June 13, 1966, is binding on us here, this trial having commenced on March 20, 1967. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882.

In the *Miranda Case,* supra, the Supreme Court stated:

"To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. * * " Id., at 478–479, 86 S.Ct. at 1630.

The arrest and interrogation of the defendant here occurred only a short time after the rendering of the *Miranda* decision; therefore, we have set out in detail the testimony relating to the warnings given by the various police officers to the defendant. The testimony is uncontradicted, except for the defendant's assertion that all of said testimony of the police officers was "bald faced stories." The jury heard

the testimony and gave to that testimony the weight it deemed appropriate. We cannot say from the record that the defendant was not effectively warned of his consitutional rights in compliance with the *Miranda* holding.

Appellant further contends that there is lacking an effective waiver of the rights alluded to above. In Miranda v. Arizona, supra, the Supreme Court provided that, after an effective warning, a suspect might waive the rights set forth.

" * * * After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. * * * " Id., 384 U.S., at 479, 86 S.Ct., at 1630.

The defendant here was 17 years of age at the time of his arrest and interrogation, and had completed the 8th grade in school. He was advised that the crime about which he was to be questioned was a "serious matter." It does not appear that the waiver given by Bridges after being advised of his constitutional rights was other than "knowingly and intelligently" given.

In assignment of error No. VII, appellant contends that on the record as a whole, there is insufficient evidence to warrant his conviction; that the said verdict was contrary to the great weight of the evidence so as to convince this Court that it was wrong and unjust; that after making all proper intendments in favor of the court below, the sentence effected was against the clear weight of the evidence so as to be unjust and unconscionable under the law and facts of the case.

The rule is clearly established in this State that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and un-

just. Cobb v. Malone, 92 Ala. 630, 9 So. 738; Stewart v. State, 38 Ala.App. 365, 84 So.2d 658; Evans v. State, 39 Ala.App. 404, 103 So.2d 40, cert. denied 267 Ala. 695, 103 So.2d 44; Jones v. State, 40 Ala. App. 419, 114 So.2d 575.

We cannot say that the verdict in this case is so patently against the weight of the evidence as to convince us that it was wrong and unjust.

Having carefully examined the record for any reversible error, whether assigned or not, Title 15, Sec. 389, Code 1940, as well as having considered all of appellant's assignments of error, it is our opinion that the judgment of the trial court should be, and is, affirmed.

Affirmed.

LAWSON, MERRILL and HARWOOD, JJ., concur.