318 So.2d 342

**Cleveland WATERS, alias**

v.

**STATE.**

**7 Div. 336.**

Court of Criminal Appeals of Alabama.

June 30, 1975.

Rehearing Denied July 29, 1975.

Myron K. Allenstein, Gadsden, for appellant.

William J. Baxley, Atty. Gen., and Kermit M. Downs, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was indicted for raping his twelve-year-old daughter. Prior to arraignment he was found to be indigent and the court appointed counsel to represent

him. He pleaded not guilty. Prior to the date of his trial his counsel suggested to the court there was question as to his competency to stand trial and amended his not guilty plea to include a plea of not guilty by reason of insanity. The court submitted the issue of appellant's present sanity and competency to stand trial to a special jury and after considerable testimony was taken, the jury returned a verdict finding appellant was presently sane.

Before the case in chief got underway, appellant withdrew his insanity plea and the case went to the jury on his not guilty plea.

The facts in this case are sordid and most revolting and no useful purpose can be served in setting forth the facts in detail. The victim was twelve years of age at the time her father allegedly raped her on the late afternoon of Saturday, June 15, 1974, and was thirteen years of age at the time of her father's trial.

Appellant and his wife had been married fifteen years at the time of his trial. Their families were originally from St. Clair County and they went to school together. Apparently the marriage was a happy one until after the birth of the rape victim who was next to the oldest child. Appellant started drinking and his drinking habits became increasingly worse. Finally, he became a confirmed alcoholic and would leave home for weeks and months at a time. When he was drunk he displayed a violent disposition to his wife and seven children, often inflicting corporal punishment on all of them. His wife asked him repeatedly for a divorce after the birth of the victim but he refused to cooperate. On one occasion he broke his wife's arm and she filed suit for a divorce. There was a reconciliation but it was not a sustained one. She had another divorce suit pending at the time of appellant's trial.

The wife testified there were times when she would not hear from appellant for months at a time. Then he would return home and stay long enough to get her pregnant and he would leave again.

On the date of the alleged rape, the victim's mother got someone to take her to Boaz, Alabama, to pay some bills. She left the victim at home to baby sit for her seventeen-month-old son and another daughter who was at home also. The other children were at a revival meeting. The mother ran into appellant in a store in Boaz and asked him to take her home. She could tell he was drinking, but she needed to get back home to her children. Appellant bought a six-pack of beer and they started home. They stopped at his brother's home and the beer was consumed. They again started home and after driving within five miles of the place where they lived, a tire blew out and appellant drove into the driveway of a friend's home and told his wife to stay there and he would walk home and try to find a spare tire and return for her.

In the meantime, the victim, her little sister and the seventeen-month-old baby had been playing in a field between their home and a neighbor's home. It was getting late in the afternoon and the victim sent her sister to the neighbor's house to pick up a maxi-dress the neighbor was making for her. Just before reaching the steps to the porch of her home, appellant suddenly appeared. She saw that he was staggering and knew he had been drinking. She was afraid of him and started to run to her neighbor's house, but appellant jumped and grabbed her tightly by the arm and forced her into the front bedroom of the house where her mother slept. He told her to take her clothes off from the waist down and she refused to do so. He slapped her and demanded that she unclothe from the waist down and he slapped her again and made her take her clothes off and pushed her down on the bed. He got on top of her and forced her legs apart and penetrated her for about five minutes. She tried to push him off her saying, "No, Daddy, don't" and she was crying. After he let her go, she was bleeding and while

she was putting her clothes back on, appellant took the bloody bedspread off the bed and carried it in the back bedroom. He said to her, "You better not tell anybody about this."

After she re-dressed, she picked up her seventeen-month-old brother and ran out the backdoor and to her neighbor's house to report that her father had forced himself into her. She met her sister coming back with the maxi-dress she had sent her for and told her to drop the dress and return to the neighbor's house and her sister told her that she was not at home, that she was out picking black berries in a patch between the two houses. She left her little brother with her sister and went to the black berry patch and found her neighbor and told her what had happened to her. The neighbor saw blood running down her legs and took her into her home and gave her some tissue to wipe the blood, but she kept bleeding and the neighbor gave her a wash cloth to use but that did not stop the flow of the blood. The neighbor suggested that she drive the victim to swear out a warrant and she agreed to go, but before they could leave, they heard the victim's mother calling her and the neighbor told her to go to her mother and tell her everything. The mother met the victim at the edge of the yard and saw the blood on her legs. She told her mother what her father had done to her.

The neighbor testified that she was picking black berries near appellant's home and heard the victim crying and saying, "No, Daddy, don't", but she thought appellant was whipping the girl as he was known to whip her pretty often. When she heard the girl say, "Daddy, please don't", she heard him say, "Shut up."

The mother went into the house and found appellant on the couch in the livingroom and asked him what he had done to her little girl and appellant said he had not done anything to the "little s.o.b.". The mother asked appellant to get a car to carry the victim to see the doctor and he said he could not get a car and to "let the little s.o.b. die."

Later that night when the preacher and his wife brought the other children from church the mother asked them to carry her daughter to see a doctor and they carried her to a hospital in Gadsden where she was seen and examined by a doctor.

She was seen in the emergency room at the Baptist Memorial Hospital at 10:30 P. M. that night by Dr. Myron H. Hawkins, Jr., where he performed a pelvic examination. He was asked what that examination revealed and answered:

"According to my records, pelvic examination revealed the hymenal ring not to be intact, there were a few small vaginal vault tears with a moderate amount of blood in the vaginal vault."

The doctor further testified that the condition he found was consistent with a forcible penetration; that the vaginal vault was moderately full of bright red blood and there were some small abrasions inside the vaginal vault.

The mother testified that her daughter's period was not on at the time of the commission of this crime and was not due for three weeks. She further said her daughter bled for several days after they left the hospital.

Appellant testified in his behalf and made a complete denial of the charge that he raped his daughter. He did admit that he and his wife had marital problems due largely to her accusing him of running with other women and about his drinking problem. He said he could and did have other women whenever he wanted them, but that his drinking problem was improving. He denied leaving home for long periods of time. As a matter of fact he testified that he slept with his wife the night before this was supposed to have happened the next day and they got up Saturday

morning and were together all day until the tire on his car went flat and he walked five miles home to try and borrow a spare tire to go back and get his wife; that when he got home, there was not a soul there; that he made a cup of coffee and went to sleep on the couch and his wife waked him up and accused him of raping his daughter and he then and there denied it. He further denied that he had beaten his wife or his children.

The wife testified that appellant had not been at home for four months before the day he raped their daughter. The neighbor corroborated the wife as to appellant's absenteeism and that he was gone from home four months prior to the day the victim came to her home and told her that her father had "forced himself into her."

At the conclusion of the state's case, appellant moved to exclude the state's evidence or in the alternative to grant him the affirmative charge. Both motions were overruled and denied.

■ Appellant's counsel made a motion to have the twelve-year-old victim examined by a psychiatrist so as to afford him adequate information to prepare a defense and to effectively cross-examine the victim. The court denied the motion pointing out there was no statutory authority for such procedure and there were no funds available to pay for such a psychiatric evaluation. Appellant claims this amounted to a denial of due process. We disagree.

During the lengthy pre-trial hearing to determine appellant's sanity and competency to stand trial, the victim testified in detail as to the occurrence and she stood up under a vigorous cross-examination. She did say she hated her father for what he had done to her but this was a most natural impulse. She became emotional during each time she was on the witness stand and the trial had to be recessed on a few occasions so that she could compose herself.

That is nothing unusual during a trial of this nature.

■ The state may on direct examination of the prosecutrix prove the bare fact that she made immediate complaint of being raped and when and to whom, and she may be corroborated by the person or persons to whom she complained as to the same fact. *Aaron v. State,* 273 Ala. 337, 139 So.2d 309; *Ellis v. State,* 244 Ala. 79, 11 So.2d 861; *Price v. State,* 41 Ala.App. 239, 128 So.2d 109.

■ Appellant, in brief, makes much of the fact that he was convicted on the testimony of one witness. In rape prosecutions the victim is usually the only witness. In our system of criminal justice, we do not travel on the numerical number of witnesses. A fact may be established as firmly by the testimony of one witness as by the testimony of an entire community. *Haggler v. State,* 49 Ala.App. 259, 270 So. 2d 690; *Gray v. State,* 38 Ala.App. 508, 88 So.2d 798; *Nabors v. State,* 82 Ala. 8, 2 So. 357.

■ Conflicting testimony is for the jury, and a verdict rendered thereon will not be disturbed on appeal. *Pugh v. State,* 51 Ala.App. 164, 283 So.2d 616.

Overruling defendant's motion to exclude the state's evidence was not reversible error where the evidence was sufficient to submit the question of guilt to the jury. *Young v. State,* 283 Ala. 676, 220 So.2d 843.

In *Bridges v. State,* 284 Ala. 412, 225 So.2d 821, the Supreme Court said:

"The rule is clearly established in this State that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly

convince the court that it was wrong and unjust. *Cobb v. Malone,* 92 Ala. 630, 9 So. 738; *Stewart v. State,* 38 Ala.App. 365, 84 So.2d 658; *Evans v. State,* 39 Ala.App. 404, 103 So.2d 40, cert. denied 267 Ala. 695, 103 So.2d 44; *Jones v. State,* 40 Ala.App. 419, 114 So.2d 575."

We cannot say that the verdict in this case is so patently against the weight of the evidence as to convince us that it was wrong and unjust. Accordingly, the judgment of conviction is affirmed.

Affirmed.

TYSON, DeCARLO and BOOKOUT, JJ., concur.

CATES, P. J., not sitting.