HARRIS, Judge.
Appellant was indicted for murder in the first degree. At arraignment he was represented by two experienced trial lawyers of his own choice. He pleaded not guilty. The jury returned a verdict finding the defendant guilty of murder in the second degree and fixed his punishment at twenty-one years imprisonment in the penitentiary. At the time sentence was imposed, he gave notice of appeal and filed a petition for a free transcript and the appointment of counsel to represent him on appeal. A hearing was held on appellant’s petition and he was determined to be indigent and a free transcript was furnished him. One of his retained counsel was appointed to represent him on appeal.
Thé testimony is conflicting in the extreme. The evidence for the State tended to make out a strong case of murder in the first degree without any mitigating or extenuating circumstances. Appellant claimed the shooting was accidental.
The homicide occurred in the early morning hours of October 5, 1975, in Florence, Alabama, at an apartment where the .deceased, a seventeen year old boy, lived with his mother, two sisters, and three brothers. *89 The deceased was the oldest of the children. The mother of these six children had been separated from her husband about three years and she was going with appellant. She testified that appellant had spent the night with her in the apartment twelve to fourteen times during the eighteen month period that she had been going with him, and that she had spent a few nights at his apartment and other places during this period of time. She further testified that appellant kept no personal belongings at her house — not even a toothbrush.
Annie Liner, mother of the deceased, testified that appellant spent Friday night, October 3, 1975, in her bedroom in the apartment located at 1454-A Carver Heights, in Florence. Her deceased son, Rohn, left the apartment around 7:30 o’clock on Saturday morning, October 4, 1975, to attend band practice at his school. Appellant did not get up until about 10:00 a. m. and he told Annie that he was missing $120.00 from his pockets and asked her if she took the money. She denied taking the money and told him that none of her six children would have taken it. Appellant then said, “What about Rohn?” Annie became upset at this accusation against her son but agreed to go with appellant and find Rohn and ask him about the missing money. They found Rohn with some of his friends on Noble Street and Annie called him to come over and get in the car. When he got in the car, Annie told him that appellant had missed $120.00 and thought he had taken it. Rohn denied taking the money or any part of it. Appellant and Annie let Rohn out of the car and appellant told Annie that he needed a drink and they went and bought a half pint of gin. After drinking the gin, appellant gave Annie $50.00 to buy groceries and carried her back to the apartment. When appellant left, he was still talking about the missing money. Annie told him if he still thought Rohn had taken his money, he should go to the police and have them bring Rohn in for questioning.
At approximately 8 o’clock that night appellant called Annie and told her he was not coming to her apartment again and Annie told him it was all right with her and broke off the conversation. Annie went to bed and around 11:50 she was awakened by another telephone call from appellant who wanted to know if Rohn was at home and she said yes and asked why he wanted to know. Appellant said he wanted to talk to Rohn. Appellant arrived some time after midnight and knocked on the door. Annie opened the door and she told appellant to wait in the living room and she would go to Rohn’s room and get him. However, when she went to awaken her son, appellant followed her into the room and started cursing Rohn in a loud tone of voice and demanded his money. Rohn was on the top bed of bunk beds in the room and Annie told appellant to leave. Rohn again denied taking appellant’s money. Annie became nervous and upset and went into the bathroom. When she came back in the room, she saw Rohn on the floor and appellant was striking him with some kind of a stick. Rohn was completely undressed except for a pair of jockey shorts. Rohn got off the floor and started running out of the house. Annie reached for her son and appellant pushed her aside and ran after Rohn who went out the front door. Annie saw appellant pointing a pistol at Rohn and heard several shots. Appellant shot and killed Rohn as he was running across the street and he fell on the street and died immediately. Appellant walked to where Rohn was lying in the street and saw that he was dead.
Charles Roy testified that he was driving by the Carver Heights Apartments in the early morning hours of October 5,1975, and when he turned off of Carver Road on Beale Street, he heard some shooting and saw the flash of a gun. He saw a young boy run in front of his car lights and across the street where he fell. He then saw appellant walk over to where the boy was lying in the street. Roy stopped his car near where appellant was standing and asked him what happened and appellant replied, “I shot this boy for nothing, go call the police.” Roy went to the home of his ex-wife and called the police. Roy further *90 testified that in his best judgment he heard four shots.
After Rohn was killed and removed from the scene by ambulance, his clothing and personal effects were searched and no money was found — not even a penny.
Police Officer James Curtis of the Florence Police Department testified that he got to the scene of the shooting'in two or three minutes after the dispatcher gave him the report. When he arrived appellant walked over to him and said he had shot the boy. Officer Curtis stopped him at this point and read him his rights. The officer then took a revolver out of appellant’s right front pocket. The revolver contained two live rounds and two spent cartridges. Later that morning another spent cartridge was found on the street near where the deceased fell. The revolver and cartridge were introduced into evidence. Photographs were taken of the scene before the body was removed and were introduced into evidence over the objections of appellant that they tended to inflame the minds of the jury.
State Toxicologist John Kilbourn testified that the spent cartridge case found in the street near the body of the deceased was turned over to him along with the revolver taken from appellant. He test-fired the revolver and compared the cartridge found in the street with the test-fired bullets and stated that the spent cartridge found in the street was fired from the pistol taken from appellant at the scene of the homicide.
Kilbourn performed an autopsy on the body of the deceased. The autopsy revealed that the deceased sustained a single gunshot wound in the back of the neck that had lacerated the spinal cord and it came to rest under his tongue. This slug was removed and tests revealed that this bullet was similar in all class characteristics to the test slugs fired from the weapon taken from appellant, but due to the mutilation of the slug, Mr. Kilbourn could not say that it was fired from the particular weapon. Kilbourn stated that the cause of death was due to the destruction of the spinal cord and shock.
Appellant testified in his behalf and offered the testimony of several witnesses who testified to his good character, that he had a good reputation for being a peaceful man, and that they would believe him under oath in a court of justice whether he was interested or not.
Appellant testified that he went in Rohn’s room with his mother on the morning or night in question and that she told Rohn to give appellant the money. That Rohn denied taking it/ Appellant stated he got a stick and hit Rohn on his legs and Rohn ran out of the room and out the front door. That appellant followed Rohn, pulled a gun out and shot into the air to scare him. He denied aiming the pistol at the boy. He stated that Rohn’s sixteen year old sister grabbed the gun and when the gun came down, it went off.
Bridgette Liner, sister of the deceased, testified that she saw appellant take “good aim” at her brother and she tried to disrupt him but appellant pushed her away. That she did not touch either the gun or the hand of appellant when he was shooting at her brother. She said the last shot was fired when appellant pushed her down.
The trial court charged the jury on all four degrees of homicide. This was more than appellant was due. Appellant shot a defenseless youth in the back of the neck while he was fleeing for his life. The deceased had not said or done anything to provoke appellant. He was trying to escape further beatings from appellant and was clad only in a pair of jockey shorts.
In a prosecution for murder it was for the jury to determine whether shooting of the deceased by appellant was accidental or whether it was intentional. Smith v. State, 54 Ala.App. 96, 304 So.2d 914; McMillan v. State, 44 Ala.App. 216, 205 So.2d 603.
Conflicting testimony is for the jury and a verdict rendered thereon will not be disturbed on appeal. Waters v. State, 55 Ala.App. 646, 318 So.2d 342; Jones v. State, 55 Ala.App. 466, 316 So.2d 713; Pugh v. *91 State, 51 Ala.App. 164, 283 So.2d 616; Morris v. State, 47 Ala.App. 132, 251 So.2d 629.
Photographs of the deceased and the locus in quo were properly admitted into evidence. Hurst v. State, 54 Ala.App. 254, 307 So.2d 62.
There was no error in overruling and denying appellant’s motion to exclude the State’s evidence. Young v. State, 283 Ala. 676, 220 So.2d 843.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur, except CATES, P. J., not sitting.