HARRIS, Judge.
Appellant was convicted of assault with intent to murder and sentenced to a term of twelve years in the penitentiary. At arraignment, in the presence of his counsel, appellant pleaded not guilty.
The victim of the assault was appellant’s sixteen-month old daughter, Stephanie Sanders.
Ms. Marie Rabón, a registered nurse at the Southeast Alabama Medical Center in Dothan, Alabama testified that on November 27, 1976 around six o’clock p. m. appellant brought his daughter to the emergency room for treatment. Ms. Rabón stated that the child had multiple bruises, lacerations and welts all over her body. She asked appellant where the child got these injuries and he stated, “I don’t know.” The nurse further examined the child and discovered that she had wounds on her abdomen, her pelvic area, her buttocks, the small of her back and down both legs. Her legs were swollen, red and hot to the touch. She asked the appellant to tell her again what happened. Appellant said he was asleep and was awakened by a child crying; that he went into the child’s room and found that she had fallen out of the bed. He stated that he started spanking her for being bad and waking him up, and the child fainted and then he carried her to the emergency room of the hospital.
Ms. Rabón further testified that the child’s body was almost totally covered “in blue, purple bruise marks. The upper part of her abdomen toward her rib cage, her elbows, and arms, and face were bruised and injured; that she had marks on her neck, and one on the forehead.” The nurse called Dr. Lies, a pediatrician, who came to the hospital, examined the child and admitted her to the hospital with a concussion, “and probable battered child syndrome.” The police were called to the hospital by the nurse with the concurrence of the doctor as they were under an obligation to report every child abuse case. She said the child remained in the hospital for three days. She further described the child as very listless and not acting normally. She stated that she found old and fresh bruises on the child. She described the older bruises as purple and the fresh ones as pink.
Ms. Rabón was recalled by the State and testified that “this was a rare case to see such outstanding marks on a child that young.”
At the time of appellant’s trial Dr. Lies was out of the state and the State and appellant’s counsel entered into the following stipulation:
“It is stipulated by and between the State and the defendant, and the defendant’s attorney, that if Dr. William Lies were present and testifying under oath on the witness stand, that he would testify that he attended this child in the emergency room; and that he admitted the child to the hospital, because of a concussion, and probable battered child syndrome, and he admitted her for three days for observation.”
*46 Police Officer Robert Hawlette testified that he went to the Southeast Alabama Medical Center emergency room on the evening of November 27,1976, and in the presence of Ms. Rabón and Dr. Lies he made photographs of the nude child. These photographs were introduced into evidence without objections.
Officer Hawlette 'further stated that he observed the injuries on the child’s body and testified, “The child had bruise spots on her legs, back and front. Bruise spots on the back and stomach.” He said the injuries in the stomach area appeared to have been inflicted with something sharp. He further stated that she had a bruise on the jaw but he could not tell if the bruise on the forehead was new or old. Hawlette saw appellant in the examining room and appellant admitted beating the child and did not appear to be worried at all about the child. He called James R. McCord, the Juvenile Officer, to come to the hospital to assist him.
James R. McCord was an officer in the Juvenile Division. ,He went to the emergency room and saw the victim of the assault and observed the injuries on the* child’s body as described by the nurse on duty when the child was brought to the hospital. McCord arrested appellant and charged him with “child abuse.” He gave appellant the Miranda rights and warnings, and appellant said he understood his rights. Appellant was transported to the station house by McCord and Police Officer Jack Adkins. On the way to the Police Department, appellant told the officers that he was watching a wrestling match on television and the baby kept falling down. He said he got a little ill at that time and put the baby in her bed. He returned to look at television and when the wrestling match was over he went to sleep, and the baby fell off the bed and “woke” him up, and he took his belt off and whipped the baby.
McCord further testified that when they got to the Police Department appellant signed a waiver of rights form and made a statement in the form of questions and answers which was reduced to writing.
Prom the record:
“Q. Will you read the questions that you asked, and then read his answers?
“A. Yes, sir. First question is: ‘What is your full name?’ He said, ‘Willie J. Sanders.’ ‘What is your address?’ ‘207 Lincoln Street, Dothan, Alabama.’ ‘What is your age and date of birth?’ He said, ‘6/21/51, age 26.’ ‘Do you have a 16 month old baby girl?’ ‘Yes, I do.’ ‘What’s her name?’ ‘Stephanie Sanders.’ ‘Did you take Stephanie to Southeast General Hospital on that day?’ ‘Yes, I did.’ ‘What was the cause?’ ‘She fell off the bed, and I whipped her with a belt, then she fainted.’ ‘Did you leave any signs on the baby?’ ‘Yes, sir, I did.’ ‘Where did you leave the signs?’ ‘On her buttocks and stomach.’ ‘Did you have a baby to die about two years ago?’ ‘Yes, sir.’ ‘What caused the death of the other baby?’ T was playing with it, and bumping it up and down, and she started choking, and then she died.’ ‘Do you have any more children?’ ‘Yes, sir, one boy about four years old.’ ‘Do you have anything else to say?’ ‘No, sir, I told you the truth.’
“Q. All right. And that was the end of the statement?
“A. Yes, sir.”
Police Officer Jack Adkins testified that he was in charge of the Juvenile Division of the Police Department and investigated the charge against appellant on November 27, 1976. He stated that he had occasion to see the victim in the emergency room of the hospital. He described the child’s injuries as follows: “It was bruised all on the front of it, down between its legs, around its vagina, and all on the sides, and had some marks about the face.”
He further stated that appellant told him that the kid fell off the bed and awakened him and he got mad and whipped the child with a belt.
The medical records from the hospital concerning the victim were admitted into evidence without objections.
*47 It developed that a preliminary hearing was set for appellant on the charge of child abuse. At this hearing appellant’s counsel made known to the Magistrate that the child abuse statute had been declared unconstitutional. (See State v. Ballard, Ala. Crim.App., 341 So.2d 957). It was then that a warrant was issued charging appellant with assault with intent to murder.
Appellant presented evidence as to. his good character and reputation in the community where he lived.
He also presented evidence by his mother and wife that he had been having severe headaches and was scheduled to go into the hospital to determine if he had a brain tumor. When the brain tumor was ruled out the doctor called in a psychiatrist for consultation and to take charge of the patient.
Dr. Fernando Lopez, a practicing psychiatrist, testified that appellant was suffering from depression with anxiety. He further stated that because of appellant’s condition he was incapable of forming an intent to murder his child.
Appellant testified that, on the night of the incident, he had put his child in her bed and went to sleep while looking at television. He stated that he heard a “loud boom” and was awakened. He said this frightened him and he lost control of himself. The next thing he remembered was that he had whipped the child and when he got back his self control he realized what he had done, and he carried the baby to the hospital. He further testified that he did not intend to kill his child and did not intend to injure her.
On cross-examination he admitted giving the officers the statement quoted above and that the statement was true. He denied that he was trying to change his testimony.
Appellant’s wife and mother both stated they saw the child at the hospital and observed the injuries on her body, and the photographs correctly showed the condition of the child in the hospital.
On re-direct examination the wife stated that she had no reservations about leaving her children with her husband while she was at work because he had never harmed them.
Appellant filed a motion for a new trial in which he raised the sufficiency of the evidence to sustain the judgment of conviction in this case.
Assault with intent to murder is an assault to take life, under circumstances which if successful would constitute murder in either degree. Horn v. State, 98 Ala. 23, 13 So. 329; Chestnut v. State, 7 Ala.App. 72, 61 So. 609.
In Bowen v. State, 32 Ala.App. 357, 26 So.2d 205, this Court held:
“Assault with intent to murder was a high misdemeanor at common law. Our statute imposing severer sanctions converts it into a felony without changing in any way its essential common-law elements.”
“We find statements in our cases that the facts to be looked to as important in determining this intent to take life, an essential element in the offense of assault with intent to murder, are the character of the assault, the use or lack of a deadly weapon, and the presence or absence of excusing or palliating circumstances. Meredith v. State, 60 Ala. 441; Smith v. State, 88 Ala. 23, 7 So. 103.
“Fully recognizing that this intent is an inference to be determined by the jury from the facts, yet this presumption of intent must be inferred from facts proved so clearly as to leave no reasonable doubt of the intent of the accused to commit murder. Horn v. State, supra.”
Applying the above pronouncements to the facts in this case it is our conclusion that the character of the assault was vicious and vigorous and there was no excusing or palliating circumstances. Appellant was a 26 year old man and the victim was a 16 month old helpless child. Thé wounds which he- inflicted upon her body were very serious and extensive. She was a severely battered child. By appellant’s own admission he was mad with the child and he used a belt in inflicting these injuries until the child fainted.
*48 The verdict of the jury .and the judgment of the trial court are solemn pronouncements, and an Appellate Court should most hesitantly disturb either. There is a presumption in favor of the correctness of a jury’s verdict, and when the trial judge, who heard the testimony and observed the demeanor of the witnesses, declines to grant a new trial, the verdict is strengthened on appeal. Peterson v. State, 227 Ala. 361, 150 So. 156.
This case is not free from difficulty, but the law is that a verdict of conviction should not be set aside on the grounds of the insufficiency of the evidence or that the verdict is contrary to the great weight of the evidence to sustain it, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the Court that it was wrong and unjust. We hold a jury question was clearly presented. Smith v. State, 53 Ala.App. 27, 296 So.2d 925; Jones v. State, 40 Ala.App. 419, 114 So.2d 575.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.